Court is now in session. Thank you. At this time, we're going to hear arguments in 2020-60299, Sierra Club et al. v. United States Department of Interior et al., and also 2020-60319, Sierra Club et al. v. United States Department of Interior et al. It's my understanding that both of these cases involve the construction of natural gas pipelines, and that both projects have the same types of effects. And so, we're going to hear argument from Ms. Ansell, that's correct, and then Mr. Huber, if you have anything different to offer about your client's situation, then you can offer your points, and then Mr. Halinen, we'll give a response to both of the petitioner's arguments, and then we'll hear briefly from Mr. Marwell and Mr. Snyder, but only as to things that they have that are different for their clients as well. So, does everyone understand that? Good. Because we don't need to have the same argument twice in a row, but we do want every party to have its opportunity to educate us about your case. I mean, can I make one, throw something out, and then you all can tell me that I'm crazy, if that would make you feel better. The government takes a position recently in the last argument that we're probably, this thing isn't really going to gel until maybe December. I mean, that's the latest. So, it could be that long before they finally get their end of it wrapped up. So, I guess the question is, what are your comments also with respect to timing, because I think that's a fair question. Certainly. So, please do address Judge King's excellent question about timing when you talk about your party's position on the situation. Okay. So, let's begin with Ms. Ansell. Thank you, Your Honors. May it please the court. My name is Devorah Ansell on behalf of Petitioner Sierra Club and Defenders of Wildlife. I would like to reserve four minutes of my time for a rebuttal. There are less than 60 endangered ocelot remaining in the United States, 53 of them in southern Texas. Approximately 14 live within the wildlife refuge directly adjacent to the Rio Grande Project site. The Fish and Wildlife Service concludes that loss of habitat unique to this region is the leading factor threatening extinction of the U.S. population. And the service has declared that creation of a contiguous corridor to link the remaining Texas ocelots is necessary for survival and recovery. And the Rio Grande Project site and nearby wildlife refuges are encompassed within those corridor lands. The service with the principal duty of protecting species from jeopardy and extinction has already approved more than 10 projects in the area, which together have authorized the loss of more than 20 Texas ocelots. In this case, the service did not analyze the ocelot as required by the Endangered Species Act, and yet the service approved the Rio Grande Project, acknowledging that it will cause additional harm to the species. But it concluded that the project would not jeopardize the species without providing any explanation of how it reached that conclusion. I plan to address the following points today. First, the service's failure to provide any take statements, omission of required terms and conditions that govern how the applicant implements the conservation measures necessary to minimize harm to the species. If time permits, I will also address the consultation reinitiation notice in consideration of the NOVA LNG. I would first like to turn to the biological opinion's failure to analyze its no jeopardy determination. Starting with the environmental baseline, it fails to analyze the more than 20 previously authorized takes for projects in the action area. This violates... Excuse me, they say in their briefs that they've authorized these takes, but in fact at the moment as things now stand, these takes have not occurred. The fact that they've been authorized doesn't mean you may be authorized to kill 20 ocelots, but none of them have been killed at the moment, except perhaps roadkill, which is not apparently their problem. Your Honor, they state that they're not aware that those takes have occurred, but that doesn't excuse them from their duty under the plain language of the regulation that states they're required to analyze the past, present, anticipated effects of those actions. The of those actions. Well, let me ask a question. When the service and the other governmental agencies involved here authorize a take, is there a continuing obligation on the part of the potential taker that they have to notify you when that's been done? So that's the issue. Certainly that is the case, but here the service has also found that any such take is likely to go undetected because of the species' nocturnal, elusive, and wide-ranging nature. And so that's why I say it doesn't excuse them from their plain duty to do that. And I would actually like to in 2018 of American Rivers versus FERC, that invalidated a biological opinion for failing to analyze impacts of authorized take that hadn't yet occurred, that amounted to a significant proportion of the species in a certain section of its existence. So there it hadn't yet occurred, but they're required to analyze that as to the ongoing effects in terms of how that will contribute to the degraded conditions and to the existing precarious state of the species. And also, this includes the analysis of future takes that the service is deemed reasonably certain to occur. That's their determination when they authorize take. And the federal register promulgating the regulations defining environmental baseline and effects of the action require them to analyze the present environment in which the species exists, as well as the environment that will exist when the action is completed. So for this analysis, that means they need to consider the effects they deemed reasonably certain to occur during the 30-year life of this project. And with regards to the more than 20 previously authorized takes, they didn't analyze those. They simply stated that if all those takes were to occur, the refuge population would be extirpated. But they did no analysis of the implications of that loss on the small and extremely isolated Texas population or on the species as a whole. It's arbitrary for them not to consider those as they contribute to the degraded conditions and the precarious state of the species. And it is... Can I ask one question? When you talk about the I take it that that is decided, or you need to tell me, is that decided only with respect to ocelots that occur in the United States? Because as I understand it, there's a lot of ocelots south of the United States all the way to Buenos Aires. So is the only area that the statute is concerned with is what dies here in this country? Your Honor, the service manages the Texas population as a significant recovery unit. They've found that reconnection with the larger species most closely south of the border in Mexico is significant to the future evolution of the genetic evolution of the species. They managed to reconnect it because of the importance they have found of the genetic connections. And in particular for wide-ranging and fragmented species like these, they must do a jeopardy analysis on this Texas population that is the focus of their management, as well as determine what that jeopardy or diminished capacities from this project would be, how that affects the long-term recovery and survival of the species as a whole. No such analysis was done here, either at the environmental baseline stage aggregating those previous effects upon which the effects of this action must be added to analyze jeopardy. That jeopardy analysis was done or explained. They simply leap to a and analyze that. It's simply unexplained. And this is the type of situation that the services owe no deference on that because it's unexplained and frankly runs contrary to substantial evidence in the record regarding the precarious state of the species, including that population connectivity and genetic variability must be achieved for the an extremely high risk of extinction within 40 to 50 years if conditions for the ocelot that will be further impaired by this project do not significantly change. Your Honor, did you address Judge King's preliminary question regarding ripeness and changes that are taking place? And does that affect these two lawsuits? Your Honor, that does not affect this lawsuit. This is a separate agency action, separate legal questions entirely. And with regards to Ms. Jaffe's statement about investment decisions at the end of December of this year, that shows that vacatur would be a proper remedy here. It would supply ample enough time for the service to do the proper analysis here. If that is in question at all, though, vacatur is the standard remedy under the APA regardless. Your Honors, this is also about the biological standing, please. I don't think that that was part of your listed outline. No, Your Honors, it was not. But petitioners meet and satisfy standing here. We have supplied several membership declarations for both organizations establishing recreational, scientific, and educational interests in protecting the ocelot, showing that they visit the red few populations, they go there to look for ocelots and study ocelots, and that the impacts of this project harming the ocelot would impair their interests. With regards to causation, the services... So they visit these particular refuges, and they have stated an intent to return? Exactly, they do. And that is both in Jim Chapman's declaration, as well as Sherry Wilcox's declaration. Is that for each organization, or is it only for one of the organizations? For both, Your Honors. Sherry Wilcox is Defenders of Wildlife, and Jim Chapman is Sierra Club, and there are a few others in there from both organizations. And we do establish causation. The services violations of the Endangered Species Act are leading to jeopardy, and that would cause further harm to the ocelot. And with regards to redressability, requiring that the service conduct the proper jeopardy analysis, and that could potentially turn to a different outcome, such as more conservation measures, greater the harms to the ocelot, and thereby our members. And with regards to the jeopardy analysis, this is also not just about the environmental baseline. This is also about the biological opinion's failure to analyze the loss of an additional ocelot from this project. That was not analyzed here, and it should be with respect to the significance of the potential loss of a breeding cat on top of the previously authorized loss in having a potential domino effect on this extremely small and isolated Texas population, and on the species as a whole. There are also a litany of direct and indirect non-lethal effects that were unexplained, and the no jeopardy determination is not explained in light of those that the service acknowledges would decrease dispersal and reduce overall genetic viability and reduce fitness for the species. So with the lack of explanation or justification of their no jeopardy determination, the service is simply of no deference given the abundance of substantial evidence in the record regarding a precarious state of the species. With the few minutes I have left, I would like to turn to the terms and conditions defining how Rio Grande will implement its reasonable and prudent measures. That violates the statute's plain requirement that the service shall set forth terms and conditions with which the applicant and action agency must comply to implement the reasonable and prudent measures that the service identifies as necessary to minimize harm from the incidental take it authorizes. And interpreting that authority, the service's own consultation handbook requires that conservation measures that are part of the project must be implemented under the terms and conditions, and the terms and conditions must provide the specific methods expressly when, what, and how the reasonable and prudent measures are to be achieved. That did not happen here with respect to the terms and conditions implementing reasonable and prudent measure one, which is comprised of the only substantive conservation measures that address direct harm to the species and habitat, including lighting scheme modifications, pipeline realignment, and less destructive drilling techniques. All that exists is a general term requiring that Rio Grande hire a compliance manager to oversee implementation of the measures. That allows the service only to enforce whether or not Rio Grande hired the proper personnel. There's simply no details or benchmarks for enforcement to ensure that the service can enforce the substantive requirements of those measures. And it matters that the terms and conditions are in the incidental take statement and not simply in FERC's project authorization. That is because there's no assurance that the substantive provisions of the Endangered Species Act will be satisfied if they're not in incidental take statement. This is the contract, if you will, between the service when it authorizes take and the applicant and the action agency. And if those terms and conditions aren't in the incidental take statement, there's no assurance that jeopardy would be properly minimized or avoided and the harms to the species would be properly minimized. And ultimately, that the statute's strict prohibition on unauthorized take would be strictly and properly enforced. That falls to the service under 1536-0. It only allows take to proceed when the service authorizes it incidental to a project provided that it complies with the terms and conditions of the incidental take statement. So absent those terms and conditions, there's no assurance that the substantive requirements of the Endangered Species Act will be satisfied. And it's notable here that FERC's authorization provides no details on the implementation of those measures. Your honors, just with my final minute, I wanted to just touch on two last issues. Then the consultation reinitiation notice violates the statute's requirement to immediately halt activities causing take limit exceedances and re-initiate consultation. The notice language provides that for clearing and maintenance activities, they should immediately stop pending re-initiated consultation. But for vehicle mortality, they can simply meet with the service and for further discussion and options. That violates the plain prohibition on making an irreversible and irretrievable commitment of resources pending consultation. And finally, your honors, it is our position that the service should have considered ANOVA in the action area here in developing the reasonable and prudent measures of the incidental take statement pursuant to 50 CFR 402.14G8. I see that my time is up and I will conclude that here. Thank you, your honors. Thank you, counsel. And you've saved time for rebuttal. Okay, we're going to hear from Mr. Huber. Thank you, your honor. My name is Eric Huber. I'm counsel for the petitioners in the ANOVA case. And I represent Sierra Club and Defenders of Wildlife in this challenge to Fish and Wildlife Services biological opinion for the endangered ocelot by the ANOVA natural gas facility, which is across the Brownsville ship channel from Rio Grande, about 0.3 miles apart. Both of these projects impact the same ocelot population and impact the same habitat corridor. In fact, they're both between two wildlife refuges. ANOVA is 0.7 miles from the Laguna National Wildlife Refuge to the north. And they are both in the South Texas ocelot corridor, which the service says is essential to the movement and genetic viability of the ocelot. And the recovery plan states in regards to the population in Texas, that in absence of population expansion and linkage with Mexico, it faces a high risk of extinction in less than 40 years. The main issue I'd like to address, because as the court noted, there are overlapping issues in these cases. So the main one I want to start with and address is leaving the Rio Grande project out of the ANOVA biological opinion altogether. There's no mention of it in there, even though these projects are right next door to each other. The Rio Grande project was in the environmental impact statement by FERC. So Fish and Wildlife Service certainly knew about it. And they should have considered it to comply with the solicitor's opinion that describes how the baseline should work in cases like this, which is the first approved case, which here was Rio Grande three weeks earlier, should be considered in the second biological opinion here, ANOVA, to consider whether Rio Grande had, as the solicitor says, fused up the resource, taken the available habitat, or taken the takes, if you will, that were remaining for the ocelot. And they didn't consider that. And the way they did that in ANOVA was to make the action area identical to the project site. And that's exactly what 50 CFR 402.02 says they're not to do. Under that regulation, the action area includes all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action. But they drew the action area line here to exclude Rio Grande. Now the record, the administrative record shows ANOVA's action area was unduly limited. And that actually the impacts of ANOVA extend beyond that limited project site. And the administrative record shows this in three ways. First, the construction noise impacts from ANOVA. This is a very large industrial facility that will involve pile driving and construction with heavy machinery going on for four years. The construction impacts can be felt by wildlife in the wildlife refuge. And that's in the record at in the environmental impact statement at FWS 002565. And the same effects are felt in the wildlife refuge to the south, which is the lower Rio Grande National Wildlife Refuge. Both of these are further away than Rio Grande. Rio Grande is actually between ANOVA and the Laguna Wildlife Refuge. So it's closer. So if noise, if the sphere of impacts, if you will, are going to be felt in these further away refuges, then they would be felt in the Rio Grande site. And they knew this. The other way the impacts extend beyond the action area is that ANOVA will eliminate 212 acres of ocelot habitat. And this habitat loss impacts the utility of the entire south Texas ocelot corridor, which is from the northern refuge down to the Mexico border is about five miles. We're talking about a somewhat small area here. But nevertheless, taking 212 acres out of that will, in their words, or as the environmental impact statement says, decrease the effectiveness of the habitat linkage with the ocelot corridor. And that's the entire corridor running from the wildlife refuge down to Mexico, like taking a link kind of a chain or weakening it. That's what they've done here. It affects the whole chain. The third way that it affects beyond the action area is the project affects taking project, taking an ocelot in the project site, for example, by traffic, by being run over or something like that. It affects the population in the refuge. And it affects population genetics and distribution of that tiny population in the refuge, which is only 13 or 14 ocelots. And this is especially true if you're dealing with a male, for example, of a breeding population and how that would affect the entire thing to take that one out of this group of 13, which is already genetically depressed and suffering from genetic viability problems. So that effect is in the wildlife refuge as well. Now, they were aware of this. They also, in the biological opinion, in their baseline, they do consider nine projects. They limit, they omit, excuse me, Rio Grande, but they consider nine other projects. Three of those are north of the ship channel. And those are Highway 48, which is also between Inova and the wildlife refuge, Highway 106, which is actually in the refuge, and the detention center. So they were aware and treated this like there were impacts that were greater than the immediate area. And one thing that I'd like to address now is whether they should have considered the Rio Grande biological opinion. Now, it shows that the Rio Grande biological opinion, excuse me, Rio Grande biological opinion includes the Inova site in its action area and not vice versa. And the reason Rio Grande does this is because of the genetic impacts of taking one ocelot would be felt in the wildlife refuge. And so they included the normal activity range of the ocelot in their action area and Inovas in that normal activity range. Nevertheless, wildlife service didn't address Rio Grande at all. It's as if it didn't exist. And they didn't explain why they did this. There's no explanation in the record of it. And it's just scientifically unsound. The Rio Grande biological opinion was the best scientific and commercial data available and should have been considered under Section 7 and 402.14g. If they have some reason for treating Inova differently, they didn't explain it and they need to do so on the record. I'd like to... What specific relief are you seeking? We're seeking vacatur of the biological opinion and incidental take statement and a remand to the agency to develop a biological opinion for Inova that takes into account Rio Grande and involves a careful and thorough analysis of the baseline based on that and based on the other projects in the baseline towards their jeopardy analysis and towards their reasonable and prudent measures. Thank you. Do you have anything else that's unique about your client's position or something that you needed to emphasize? The thing I'd like to add at this point is the errors in the baseline here are substantially similar to Rio Grande. They acknowledge in one sentence that if all authorized take had occurred, the refuge population would be extirpated. But they don't discuss how that would affect the Texas population. They don't discuss how that would affect recovery. There's no analysis there. They just leap to, well, there's no effect on the species as a whole. And that's not appropriate or thorough because they have to take into account these takes in the baseline, whether they've happened yet or not. That's because anticipated impacts have to be considered in the baseline under 402.02. And prior takes, those other nine projects, they have found they're reasonably certain to occur. So they have to treat them as if they have occurred. And that's 402.14 G7. Really, they looked at the wrong time period here. They looked at the moment of the biological opinion and not the length, the 30-year length of the project and all the takes that would occur in there and whether they can just add one more, as is their practice with Rio Grande and then this one. So in conclusion, yes, we're just asking the court to vacate the biological opinion and remand to the service. And I will save my time for rebuttal. Thank you. Thank you. You may proceed. Good afternoon, your honors. I'm the police, the court, Daniel Halani for the federal respondents and above cases. I think at the outset, it's important to emphasize that the biological opinions that we're discussing here today are the culmination of years of work by Fish and Conservation for decades. And it's through marshaling all of that experience that the service was able to conclude that first authorization of these two projects independently was not likely to jeopardize the species under consideration here. I think the arguments that the petitioners are making in both of these cases fall into essentially two different buckets of types of issues. The first concerns the drafting of the petition. Petitioners have found a few things to nitpick and criticize about the writing in the opinions, about how the biologists have put them together. And they're asking the court essentially to line edit a biological opinion, but that is not the purpose of review under the Administrative Procedure Act. The second type of issue concerns the nature of the Section 7 consultation that the service is performing here. Petitioners seem to just sort of fundamentally disagree that these projects can go forward consistent with the Endangered Species Act, but their arguments just don't comport to how Section 7 consultations actually work under the statute and the implementing regulations. So the bottom line here is just that these are our standard biological opinions prepared by the service consistent with decades-old guidance on how to put these documents together that comply with all the statutory and regulatory requirements. I'm happy to answer the court's questions. I guess I'll start with addressing Judge King's questions about timing and the scope of the jeopardy analysis. And then I would also just touch on a couple issues, the baseline, the sort of consideration of the two projects in each other's biological opinions, and then the terms and conditions. So first in terms of... Let me just ask one question. The case before you, the prior, so to speak, the government takes the position that there's going to be a lot of changes, and so really this thing may not gel until the end of the year, December. So what they basically want us either to go into a holding mode or just to dismiss the appeal and wait till the next one comes up. And you're a representative of the government, but what I need to know from all of the four of you who are here, how does that affect the other issues that are in front of us? I mean, for example, does the government think that we ought to just dismiss the ANOVA to the ANOVA project issue as well? I mean, we've got a sort of recommendation of something that sounds very good to an appellate judge, which is just, you know, scratch it and start over again in a year. Sounds mighty attractive. But the question is, that's a very broad brush, and there are much more specific issues here, for example, with the ANOVA project. I don't know where we stand with all of this. If, as the government asks, we just dismiss this appeal and say, too bad, start over when you're I guess maybe I should have asked Ms. Ansel, but that's the question. Where are we? As far as the four of you are concerned, where are we? So, my understanding is that for both projects, both Rio Grant Project, as discussed in the previous argument, and the ANOVA project, the final investment decision is still forthcoming. But we don't think that in this case that requires the court to hold the petitions in or to, you know, refrain from deciding the issue because the biological opinion is a distinct agency action. You know, there is potential if there are developments down the line that require additional consultation that might yield something different. But the action in front of the court today, I think, is right for adjudication. This is a final decision by the Fish and Wildlife Service. And at this stage, you know, the service is not engaged in another round of consultation. So, these are appropriate biological opinions for the court. When you say that, you're talking about the ANOVA project. For both projects. For both projects. Yes. So, these types of things, these reviews of the species and the biological situation, these are right for review. And that's everybody in this case thinks that, right? As far as the government. The government does. And I think that Ms. Ansell said that, and Mr. Huber didn't say anything different, but he can say something different on rebuttal if he wishes. But, and I guess I'll ask the other two lawyers. But you believe it's right because there is a, they're not going and revising the biological determinations, right? Unless we, unless that's the subject matter of this suit. But there's not that, that's not already going on like in the other case where they're going and revising something that they're challenging. That's correct. The FERC did ask the Fish and Wildlife Service earlier last year about a modification to the pipeline, the Rio Bravo pipeline for the Rio Grande project. The service responded with a letter on the FERC docket advising FERC that they don't think there's any modification required or amendment to the biological opinion. So, this is still the final biological opinion for the Rio Grande projects that the service considered. Final agency action. Correct. Which is the magic word. Okay. So, can you answer why the ANOVA doesn't mention the other project that seems like a really big thing to leave out? Sure. So, the reason that the ANOVA biological opinion does not discuss the Rio Grande project is because it's not within the ANOVA action area. And that's a determination made both by the Fish and Wildlife Service and by FERC. As you can see in the biological opinion itself, the service concluded that the ship channel is the northern border of the action area for ANOVA. And that was consistent with the determination that FERC itself made. Mr. Huber pointed out there are parts of the FERC environmental impact statement that discuss effects of the ANOVA project, which suggests there might be effects that go across the ship channel. But I don't think that those – so, first of all, those are citations from FERC's environmental impact statement. FERC itself concluded that that ship channel is the northern border. So, you know, that didn't alter FERC's analysis. But second, also, if you look at the actual information that FERC was talking about, for example, this is at 2564 to 2567 in the ANOVA record where it's talking about, you know, noise from the ANOVA project that might go across the ship channel. It says that this noise is barely perceivable or noticeable to humans. And with respect to animals, it would be expected to be minor and limited. So, you know, I don't think that specific citation to information in a FERC document upsets the rational judgment that the Fish and Wildlife Service made about where to draw the northern border of the action area. And that's important because the action area determines the environmental baseline. And the environmental baseline is the basis against which the service judges the effects of the ANOVA project for the jeopardy determination. The other area where, you know, the Rio Grande project might come in is through a cumulative effects analysis. But I think it's black letter law under Section 402.02 of the regulations that the cumulative effects analysis does not include federal actions. That's limited to state and private actions. So, regardless if you're looking at the environmental baseline or the cumulative effects analysis, the Rio Grande project simply does not fall within the scope of analysis that the service is engaged in here. Ms. Ansel says this conflicts with American Rivers. Do you want to address that case? Sure. So, American Rivers was about a hydroelectric project where the record suggested that there was going to be 90 to 100 percent loss in populations from endangered species. And the court on that basis concluded that the service had to provide more endangered species would not jeopardize the continued existence of that species. And that's simply just a different situation than what we're dealing with here, where the service has authorized or anticipated take of one cat. And if in both of the biological opinions that we're looking at here, the type of take that the service was thinking about was things like Rio Grande, a biological opinion even said that the service thought it was unlikely that construction would yield lethal take. So, the only area where the service was really thinking that there was a possibility of lethal take of one cat from either of these projects was through vehicular mortality, the possibility that a vehicle on one of the access roads for these projects would strike an ocelot. But even there, the service said, well, the project developers have both agreed to impose 25 mile per hour speed limits that is going to reduce the likelihood that any such strike would be lethal take. So, I think American Rivers is talking about, you know, extirpation of 100 percent of an endangered species population within the action area. And here we're talking about that, you know, most of the take that they're considering is non-lethal for just one cat out of an entire population. And I think this gets back to a question that Judge King asked earlier about what the appropriate focus is for the jeopardy analysis. The ocelot is listed throughout its entire range, the entire 22 country range. You know, most of these cats do not live in the United States. If you look at the maps that we've cited in our briefs, the range just sort of pokes up a little bit into Texas. And, you know, there have been populations known in Arizona previously. But in the recovery plan for the ocelot, for example, the service commented about how, you know, there are much larger populations across the Rio Grande in Mexico. So, when we're talking about the population here, while that is the focus of the service's conservation efforts for the reasons laid out in the recovery plan, when we're talking about jeopardy, it is a species listed across 22 countries. So, that is the entire population, or excuse me, the species that we're talking about when we're talking about jeopardy. Your opponents argued that it was just a snapshot, this one take of this one cat, and that it didn't take into consideration the entire period of the time. Did you want to address that? Sure. So, I think that's what the environmental baseline is, is the snapshot of the current condition of the action area at a moment in time. And that is what the service has always said in its handbook for 30 years, the Ninth Circuit has adopted that standard. I think that that's the basic function of the environmental baseline is to provide a basis for comparison when looking at the effects of the project. I think what the petitioners are trying to persuade the court to do here is to sort of reopen past consultations that the service has done for other federal actions and think about tape that has been authorized in the Section 7 consultations for those projects as automatically equivalent to the loss of a cat. But that's simply not borne out by the record. As was discussed earlier, you know, the service using the best data available to it has found no evidence of the loss of any cat from any of those projects. And I don't think that's contested. And the environmental baseline is concerned with the status of the species as it is, not with sort of regulatory authorizations that may or may not actually have anything to do with the actual effects on the ground, particularly where we're talking about projects where, you know, construction has long since completed, the scope of the authorization has expired, and where the service has authorized non-lethal tape. I see that my time is about to expire. Unless the court has any further questions, we would ask the court to deny both petitions. Thank you. Mr. Marwell? Good afternoon, Your Honor. May it please the court, Jeremy Marwell, for the industry interveners in the 260299 case. So this is Rio Grande and Rio Bravo. I'd like to start with Judge King's question on timing. We agree with the government that there is final agency action, and this matter is right. As the government indicated, there was further correspondence with the service between FERC and the service, and my understanding is in August 2020, the service issued a letter that said there won't be any changes due to the, you know, FERC amendments, and that the same indication is in an order that the FERC issued on rehearing with regard to the terminal design changes. It's an order on January 19, 2021, indicating that the effects on listed species are reduced or unchanged. So we don't see any ripeness issue. I will focus on issues particular to the Rio Grande, Rio Bravo case, understanding that this court's review, obviously there are relations between the biological opinions, but the court needs to review each one on the agency record before the agency with respect to that project. On the question of baseline and the jeopardy determination, I do think it's important to recognize that, as I understand it, the petitioner's challenge is only to the service's explanation, not to the question of whether it is lawful to have authorized one take, and they said that at page 22 of their reply brief. And as to the explanation, we agree with the government that what the service did here was a textbook baseline. They looked at what had happened, and they analyzed the best information that we have right now about the status of the species. With respect to the question of how do we know, the service does impose notification requirements, Judge King, and they did that in this biological opinion at record 3300 to 3301 in terms of detecting potential take. On the argument that the service needed to analyze sort of 30 years into the future, the 30-year lifetime of the project, that's an argument we didn't have a chance to brief because it came up in the reply brief, but we don't view that as consistent with the plain language of the regulation, the definition of baseline, which says the past and present impacts of federal, state, or private actions, and then the anticipated impacts of proposed federal projects in the area. Also, if conditions were to change going forward, I take the thrust of the concern to be, well, what if one of those other projects suddenly starts having impact on cats? The service's regulations require it to reinitiate consultation. That's 402.16 of their regulations. If conditions change on the ground in a material way. On the question of enforcement, we did file a 20HA letter. There were three voluntary conservation measures that were at issue here. One of them is the purchase of a thousand acres of habitat to be permanently put in conservation. That has now occurred, and we believe it's moot. The petitioners filed a response of 20HA. I think they agree with us as to that aspect. There is no dispute that we are required to do these measures. FERC said so explicitly and repeatedly in their orders. In fact, the petitioners raised this exact concern before FERC, and in the order on rehearing, FERC clarified, if any clarity was needed, that we are required to do this. These are conditions of our certificate, and we can't put a shovel in the ground without FERC's okay. I think the thrust of the petitioner's argument seems to be that there needs to be some enforcement measure under the Endangered Species Act itself, that it isn't enough, that these would be required by FERC. I don't think that's consistent with this court's decision in Medina County, where it said it was reasonable for the service, when they're looking at the effects on endangered species, to think about things that the developers are required to do. In that case, I believe it was something that was required by a state agency. Here, it's another federal agency. In any event, the terms and conditions here do refer to the conservation measures, and I think the narrowest potential ground for you to rule would just be to say it was reasonable for the service to choose those particular implementing measures, which involved reporting and appointing somebody whose responsibility it is to make sure that that occurs. On the question of whether there was something wrong with the reinitiation provisions in the biological opinion about the immediate halt activities, the regulation only talks about prohibition on the irreversible commitment of resources that would foreclose a reasonable and prudent alternative. That's not an issue here, and anyway, you don't have to address that. That's something that would come up if and when we had, and the take on it was exceeded. And then on the ANOVA question, with regard to our case, so whether ANOVA needed to be considered in the biological opinion for Rio Grande, Rio Bravo, I think that starts and ends with the plain language of the regulations defining baseline and accumulative effects. I think it's a full answer because of the timing of the two biological opinions, the Rio Bravo, Rio Grande one went first, and then ANOVA, it would have been arbitrary and capricious for the service to consider ANOVA in our case, and that's all you have to say to deal with that issue in the Rio Grande case. Unless there are other, any questions, I'm happy to rest the remainder of my time. Thank you. Thank you, Your Honor. Mr. Snyder. Good afternoon, and may it please the court. My name is Brett Snyder. I am counsel for intervener ANOVA LNG Common Infrastructure, the project proponent in number 20-60319. To start, I'd like to answer Judge King's question. The ANOVA project is completely independent of the Rio Grande and Rio Bravo pipeline, so anything having to deal with timing of that project is not relevant to our case, and our case is ripe for review and final, in this final agency action. Sierra Club's lead argument in its reply brief is that the Rio Grande project should have been included in ANOVA's environmental baseline. On this issue, Sierra Club must show that it was not rational for the service to conclude that ANOVA's direct or indirect effects on the Ocelot and Jaguarundi would not extend across the Brownsville Ship Channel to the Rio Grande project site. However, the record evidence supports the service's position. The action area is not determined by proximity, but where the direct and indirect effects of the project will be felt on the Ocelot. The direct and indirect effects of the ANOVA project include habitat loss, human disturbance, possible vehicle collision, light, and noise. The first three are restricted to the project site, and ANOVA took mitigation seriously and took steps to significantly minimize light and noise. One of the voluntary conservation measures is an aggressive lighting plan that ANOVA devised to minimize or eliminate light on adjacent undisturbed habitat. The service considered noise effects in detail and determined that the most severe noise would be from vehicles on the access road in the vicinity of the project site. The service has correctly pointed out that the action area does not equate to the range of the species. Therefore, the service had to decide what the boundaries of the action area were. Given the distance and mitigation, it was reasonable for the service to conclude that the identified direct and indirect effects would not be felt across a body of water on the north side of the Brownsville ship channel. In their reply, and here at argument, petitioners attempt to point to additional record sites to respond to this criticism. However, upon close inspection of petitioners' record sites pertaining to the Rio Grande project, you see that they do not support petitioners' position. Petitioners cite to section 4.6 of the ANOVA environmental impact statement, which is prepared by FERC pursuant to NEPA, and that includes the reference to noise that Mr. Huber made earlier. However, while section 4.6 of the EIS discusses ANOVA's potential direct and indirect effects on other types of wildlife generally, birds for example, none of the cited by petitioners in their reply brief discuss direct or indirect effects on the ocelot or jaguarundi, which is the relevant question. Instead, a different section of the EIS, section 4.7, pertains to special status species and includes a discussion of ANOVA's direct and indirect effects under NEPA on the ocelot and jaguarundi. The discussion of the endangered cats does not include any reference to the Rio Grande project or to the Rio Grande project site. Consequently, petitioners do not and cannot cite the only potentially relevant section of the EIS that might inform a definition of an action area. And I would just add to this too that courts, including the Fifth Circuit, have found that indirect effects under the ESA are more narrow than indirect effects under NEPA, and so merely pointing to effects in a NEPA document do not equate to relevant indirect effects under the ESA without more. The Rio Grande, the petitioners also point to the Rio Grande biological opinion and the EIS, ANOVA and the respondents have argued at length why these documents are not on the ANOVA record. However, even if these documents were to be considered, they do not support the petitioners. As pointed out by both the service and ANOVA, the Rio Grande project is a larger project, approximately four times the production size, located across the shipping channel and geographically closer to the Laguna Anacosta refuge. It also has a 135-mile-long pipeline that of ocelots, which is approximately 11 miles away from ANOVA. In light of these facts, even if the Rio Grande's action area was broader than ANOVA's, it does not follow that these action areas should be the same or that the service is changing its position. In fact, it would be remarkable if the action areas were the same. Mr. Huber referenced the solicitor's opinion about sequential review of federal projects. That opinion, again, focuses on the concept of action area and you only review sequential federal projects to the extent they're relevant, which means that they are within the same action area. Do you have anything further, counsel? I do not. Okay, thank you. We have your argument. Ms. Ansell, you've saved time for rebuttal. Quickly, I just want to distinguish the Medina case that I believe Judge King has authored. That case was different because it did not involve formal Section 7 consultation. It involved informal consultation and it did not authorize incidental take to that project. Therefore, in that situation, the Endangered Species Act did not impose specific mandates on the service. Here, we are involved in formal Section 7 consultation at the completion of which the service authorized incidental take for this project. Therefore, the Endangered Species Act imposes strict mandates that the service issue an incidental take statement that sets forth the allowable take level, the reasonable and prudent measures it deems necessary to minimize harm from that take, as well as specific terms and conditions that govern how the applicant will implement those measures. That is different here. Furthermore, with regard to the depiction of the environmental baseline as simply a snapshot that is taken out of context, that's one word in the consultation handbook that also says that the service must analyze the past, present, anticipated, and ongoing effects of those actions. Further, that environmental baseline must analyze and aggregate those past effects and ongoing effects and takes as they contribute to the degraded conditions and the precarious state of the species. That was not done here. With regards to respondents' depiction of the take limit, that kind of backing away from lethal take, the take limit here explicitly says that it's the take for harassment and harm of an ocelot. Under the Endangered Species Act, harm explicitly includes killing. So it does provide for lethal take, and it goes on to say, including from the high risk of vehicle mortality. Vehicle incidents are the leading cause of ocelot death. It is prescribed right there in the take limit. He states that in any event, Rio Grande will implement a 25-mile-per-hour speed limit. However, nowhere in the incidental take statement is the service requiring that and mandating that to enforce. And then finally, with regards to the jeopardy analysis, it is petitioner's position that this is about their failure to explain and justify their analysis, their jeopardy determination. They have an abundance of substantial evidence in the record regarding the precarious state of the species, and they simply have not explained how they've reached that no jeopardy determination. Thank you, Your Honors. Thank you. Am I up? Yes, you're it. You're it. I'm sorry. You're up. Thank you. Regarding the Inova case and the sphere of impacts of the Inova project, I'd like to respond to a few facts that government lawyer Mr. Snyder made. Mr. Halladin cited to the environmental impact statement at FWS002565 and said that impacts would be minor in the wildlife refuge from the noise. And it's true, it says that from operation and in regards to operation, but it's different for construction. And the construction goes on for four years. And regarding that, it says that there will be disturbance from increased noise, nighttime lighting, and dredging within the BSC. That's disturbance. And it talks about that animals have different sensitivity to noise frequencies than humans. And construction noise will be audible at off-site locations. And in the biological opinion for Inova, it talks about how noise interrupts feeding, sheltering, distribution, all of these things for ocelots and how sensitive they are. They just don't make the connection to the distance of it. They just look within the actual footprint of the project. And that's what FERC did wrong also in its biological assessment. It didn't look at the noise extensions of its own environmental impact statement. It just came in in a biological assessment and drew the line with the project site and then looked at noise within it. And that's all they did. And in another part of the same biological assessment, however, they refer to the facility as being within the Inova action area. And that's the facility. That's not the marine terminal or the pipeline, but the facility, which is the phrase they use, for example, to refer to Inova's LNG terminal. And at best, FERC was internally inconsistent on that, but really they weren't. They said facility, and this is a post hoc rationalization that they've come along in the litigation to explain what FERC meant. But the court really doesn't even need to to define the action area under 402.14g that determines what is in biological opinions. That's actually even entitled Fish and Wildlife Service responsibilities. So if FERC made a mistake, if FERC acted contrary to its environmental impact statement, Fish and Wildlife Service should have caught it. And they're responsible for what's in their own biological opinion, and they don't mention Rio Grande at all. All of these explanations about why it wouldn't be in there, none of them are in the biological opinion. They acted as if it doesn't exist, which considering it was three weeks earlier and signed by the same officer in the same office, is just against the record that should have been before the agency. Okay, you need to wrap it up because I think your time has expired. Oh, and I have so much more too. All right, thank you for your time, your honors. Thank you. We appreciate all of council's arguments here today, and you're appearing by Zoom so we could facilitate this. These cases are both submitted. Thank you.